2011 ME 76

**STATE of Maine**

v.

**PRICE–RITE FUEL, INC. et al.**

Supreme Judicial Court of Maine.

Argued: April 14, 2011.
Decided: July 5, 2011.

George J. Marcus, Esq., David C. Johnson, Esq. (orally), Marcus, Clegg & Mistretta, P.A., Portland, ME, for Price–Rite Fuel, Inc., Veilleux Oil & Service, Inc., Perron Fuel, Inc., and Nicholas Curro III.

Janet T. Mills, Attorney General, Linda J. Conti, Asst. Atty. Gen. (orally), Carolyn A. Silsby, Asst. Atty. Gen., Office of the Attorney General, Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] This appeal arises from the failure of a fuel delivery business to fulfill its prepaid delivery contracts during the winter months of 2007–2008. Price–Rite Fuel, Inc., Veilleux Oil & Service, Inc., Perron Fuel, Inc., and Nicholas Curro III, (collectively Price–Rite) appeal from a judgment entered in the Superior Court (York County, *Brennan, J.*) denying their motion for judgment as a matter of law, and finding corporate and personal liability for violations of the Maine Unfair Trade Practices Act (UTPA), 5 M.R.S. §§ 205–A to 214 (2010). Price–Rite contends that the court erred in denying its motion for judgment as a matter of law on the ground that the Attorney General failed to comply with the ten-day notice requirement of 5 M.R.S. § 209 prior to filing its complaint. Curro also contends that the court erred in imposing a civil penalty on him for intentionally selling prepaid oil contracts that did not comply with the security requirements

of 10 M.R.S. § 1110 (2010). We affirm the judgment.

## I. BACKGROUND

[¶ 2] The court could reasonably have found the following facts, which are supported by competent evidence in the record. *See Sanseverino v. Gregor*, 2011 ME 8, ¶ 2, 10 A.3d 735, 737.

[¶ 3] Curro and his brother owned and operated Price–Rite, with Curro serving as the president and chief executive officer. Each year since 2005, Price–Rite sold prepaid contracts for specific quantities of fuel at a fixed price to residential customers for the upcoming winter. The contracts required Price–Rite to make automatic deliveries. Prior to purchasing the contracts for both 2006–07 and 2007–08, a customer asked Price–Rite to confirm that it had complied with 10 M.R.S. § 1110(2), which requires the dealer to provide security for

deposits submitted for prepaid fuel contracts.[1] In response, Curro signed a copy of the statute on which he wrote: "we are totally in compliance with the prepaid contracts for heating fuel." However, in 2007–08, the Price–Rite contracts were not secured by any of the methods provided for in 10 M.R.S. § 1110(2).

[¶ 4] By December 2007, Price–Rite was unable to purchase sufficient heating oil to meet its contractual obligations. The company stopped the automatic delivery of fuel required by its contracts and asked customers to call for delivery. It also began to only partially fill its customers' tanks. By February 5, 2008, over 320 Price–Rite customers had called the Maine Attorney General's Office to complain.[2]

[¶ 5] On January 18, 2008, the State filed a five-count complaint charging Price–Rite with four violations of UTPA[3]

---

1. Title 10 M.R.S. § 1110 (2010) establishes requirements for price protection and prepaid contracts. Section 1110(2) provides:

    **2. Security for prepaid contracts required; options.** A home heating oil, kerosene or liquefied petroleum gas dealer may not enter into a prepaid contract to provide home heating oil, kerosene or liquefied petroleum gas to a consumer unless that dealer has obtained and maintains in accordance with subsection 3 any one of the following:

    **A.** Heating oil, kerosene or liquefied petroleum gas contracts or other similar commitments that allow the dealer to purchase, at a fixed price, heating oil, kerosene or liquefied petroleum gas in an amount not less than 75% of the maximum number of gallons that the dealer is committed to deliver pursuant to all prepaid contracts entered into by the dealer;
    **B.** A surety bond in an amount not less than 50% of the total amount of funds paid to the dealer by consumers pursuant to all prepaid heating oil, kerosene or liquefied petroleum gas contracts entered into by the dealer; or
    **C.** A letter of credit in an amount not less than 100% of the total amount of

funds paid to the dealer by consumers pursuant to all prepaid heating oil, kerosene or liquefied petroleum gas contracts entered into by the dealer.

2. Independently, the Biddeford Police Department began investigating complaints by individuals that Price–Rite, without authorization, had been using their credit and debit cards, and in late January executed a search warrant related to that investigation seizing Price–Rite's business records and computers.

3. These included:
    1. Violation of 5 M.R.S. § 207 (2010) by deceiving consumers as to Price–Rite's ability to fulfill prepaid fuel contracts;
    2. Violation of 5 M.R.S. § 207 by failing to deliver fuel to customers who had prepaid for fuel, as contracted;
    3. Violation of 10 M.R.S. § 1110 by failing to obtain and maintain the security required for such prepaid contracts, which constituted a violation of 5 M.R.S. § 207; and
    4. Violation of 10 M.R.S. § 1110 by failing to disclose a method of security to customers of prepaid fuel contracts, which constituted a violation of 5 M.R.S. § 207.

and one count of fraud.[4] It requested monetary relief for the customers who were harmed, civil penalties, and costs. The Attorney General's Office failed to notify Price–Rite that it intended to file the complaint ten days in advance of its filing, as required by 5 M.R.S. § 209. Accordingly, Price–Rite did not have the opportunity to confer with the Attorney General regarding the complaint before it was filed.

[¶ 6] On February 7, 2008, the State filed an amended complaint, in which it corrected certain errors in the original complaint but made no substantive changes. The State also filed a motion for a temporary restraining order (TRO) on that date, seeking injunctive relief that would prohibit Price–Rite from continuing to conduct business. The motion was accompanied by affidavits from eight consumers, all of whom stated that they had prepaid Price–Rite for fuel and were not receiving the deliveries that they had contracted for; an affidavit from a complaint examiner employed by the Attorney General's Office stating that more than 320 customers had complained that Price–Rite owed them fuel for which they had already paid; and an affidavit from a Biddeford police officer, who, as a result of his independent investigation, believed that Price–Rite was in the process of liquidating business assets and that Price–Rite owed its customers in excess of $418,000.

[¶ 7] The court issued an order preliminarily enjoining Price–Rite from conducting business in violation of the UTPA and from accepting deposits from customers in advance of delivering goods or performing services. The court also appointed a monitor for Price–Rite's real and personal property to, among other things, prepare an inventory and approve or deny the payment of debts and collection of receivables pending resolution of the litigation. When granting the TRO on February 15, 2008, the court specifically found that the State had established "good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers in the form of monetary redress" would result without the issuance of a restraining order.

[¶ 8] Price–Rite answered the amended complaint but did not reference the State's failure to comply with the ten-day notice requirement of 5 M.R.S. § 209. After the parties were unable to resolve the case through an alternative dispute resolution conference and a judicial settlement conference, they proceeded to a jury-waived trial.

[¶ 9] At the close of the State's case, Price–Rite moved for judgment as a matter of law, arguing for the first time that judgment should be granted to it because the State had not complied with the notice requirement of 5 M.R.S. § 209. Price–Rite renewed that motion at the conclusion of its case. Although neither party disputed that notice had not been provided pursuant to the statute, the court denied the motion, concluding: "The failure to provide notice prior to the commencement of litigation does not deprive the Superior Court of subject matter jurisdiction."

[¶ 10] The court subsequently issued a detailed injunction that prohibited Curro and any business entity that he controls or in which he has majority ownership from selling any prepaid contracts for home heating oil, kerosene, or liquefied petroleum gas for a period of five years. The judgment also required Price–Rite to pay restitution of $393,735 to the Attorney General on behalf of 313 consumers, and to pay a civil penalty of $250,000 after the

4. The parties stipulated to the dismissal of the     fraud count.

restitution has been paid in full, with all but $25,000 of the penalty suspended if the restitution is paid within five years. The court also imposed a civil penalty on Curro for the UTPA violations, finding that the violations were intentional and that "[a]n officer of a corporation who intentionally and knowingly violates the UTPA is personally liable for damages and penalties arising from such a violation." This appeal followed.

## II. LEGAL ANALYSIS

### A. Notice Requirement of 5 M.R.S. § 209

■■ [¶ 11] Price–Rite contends that the Attorney General's failure to comply with the ten-day notice requirement of 5 M.R.S. § 209 precludes the State from obtaining relief pursuant to the UTPA, and that the court should have granted its motion for judgment as a matter of law on this basis. The State argues that the failure to provide notice is not a jurisdictional bar to the court's consideration of the case, and in any event, it was authorized to proceed without notice because it made a "showing of facts by affidavit [establishing] immediate irreparable harm to the consumers of the State" pursuant to 5 M.R.S. § 209.[5] We review de novo the denial of a motion for judgment as a matter of law pursuant to M.R. Civ. P. 50. *Garland v. Roy*, 2009 ME 86, ¶ 17, 976 A.2d 940, 945.

[¶ 12] At the center of this appeal is the ten-day notice requirement of section 209, which provides, in relevant part:

At least 10 days prior to commencement of any action under this section, the Attorney General shall notify the person of his intended action, and give the person an opportunity to confer with the Attorney General in person or by counsel or other representative as to the proposed action. Notice shall be given [to] the person by mail, postage prepaid, sent to his usual place of business, or if he has no usual place of business, to his last known address. *The Attorney General may proceed without notice as required by this section upon a showing of facts by affidavit of immediate irreparable harm to the consumers of the State.* The action may be brought in the Superior Court of the county in which such person resides or has his principal place of business, or may be brought in the Superior Court of Kennebec County.

5 M.R.S. § 209 (emphasis added).

[¶ 13] The court denied Price–Rite's motion for judgment as a matter of law, explaining that although it was "undisputed that notice was not provided," the failure was inconsequential for three reasons: (1) "the affidavits and supporting materials filed in support of the TRO demonstrate a need for immediate action to prevent potentially irreparable injury"; (2) "notice and an opportunity to confer likely would have been futile in light of the independent actions of the police, which forced a shut down of the business within days of the filing of the complaint"; and (3) "the proper remedy had the issue of lack of notice been raised sooner would be to stay the proceeding to permit the parties to confer. . . . [T]his would again be a futile gesture."

5. Although the State argued in its memorandum of law in support of the motion for a TRO that to obtain injunctive relief, it was not required to prove immediate irreparable harm separate from proving a violation of UTPA, it nevertheless filed affidavits establishing such harm sufficient to fulfill the prereq-uisite for proceeding without notice in 5 M.R.S. § 209 (2010). Contrary to Price–Rite's contention, the State did not forfeit consideration of the separate issue of whether it established immediate irreparable harm that would entitle it to proceed without notice in this case.

[¶ 14] Price–Rite contends that the Superior Court's focus on the absence of practical consequences resulting from the Attorney General's failure to provide advance notice misses the mark because section 209's notice requirement is unambiguous, and an unambiguous statute must be interpreted according to its plain language. *See Me. Ass'n of Health Plans v. Superintendent of Ins.*, 2007 ME 69, ¶ 34, 923 A.2d 918, 928. Price–Rite thus asserts that the statute's command that the "Attorney General *shall* notify" the potential target of an action means that a failure to provide notice should preclude the State from maintaining an action pursuant to the UTPA, 5 M.R.S. § 209 (emphasis added), and that the court erred by denying its motion for a judgment as a matter of law.

[¶ 15] Price–Rite's argument fails to recognize that the affidavits filed by the Attorney General in support of the motion for a temporary restraining order brought this case within section 209's exception to the notice requirement. Had Price–Rite asserted an objection to the State's proceeding because it was not provided the ten-day notice in response to the initial complaint, the court may have, in the exercise of its discretion, ordered the dismissal of the complaint. This defect was cured twenty days after the initial complaint was filed, however, when the Attorney General filed the affidavits that established irreparable injury. In the absence of a showing that Price–Rite was actually prejudiced by the filing of the affidavits twenty days after the filing of the initial complaint, there was no basis for the court to grant Price–Rite's motion for a judgment as a matter of law.

[¶ 16] Because the Attorney General "may proceed without notice ... upon a showing of facts by affidavit of immediate irreparable harm to the consumers of the State," 5 M.R.S. § 209, and this showing was made soon after the filing of the initial complaint and before any objection was raised by Price–Rite, the court did not err in denying Price–Rite's motion for judgment as a matter of law.

**B. Individual Liability for Violations of the Maine Unfair Trade Practices Act**

[¶ 17] The UTPA makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce...." 5 M.R.S. § 207. For each intentional violation of this prohibition, the Attorney General may seek a civil penalty up to $10,000. 5 M.R.S. § 209. The court imposed a civil penalty on Curro for intentional violation of the UTPA because, among other things, he "formulat[ed] and [sold] prepaid heating fuel contracts for the 2007/2008 heating season" when he knew Price–Rite was not in compliance with the security requirements of the statute. Curro does not dispute that his actions violated the UTPA or that he could be held personally liable. He contests the imposition of a civil penalty on the basis that he acted intentionally. Curro contends that the court's finding that he intentionally violated the UTPA was clearly erroneous, and that the civil penalty should not have been imposed.

[¶ 18] The existence of intent is a question of fact to be determined by the fact-finder. *Flaherty v. Muther*, 2011 ME 32, ¶ 55, 17 A.3d 640, 656. We review the trial court's findings of fact for clear error and affirm if there is competent evidence in the record to support the judgment. *Lyons v. Baptist Sch. of Christian Training*, 2002 ME 137, ¶ 13, 804 A.2d 364, 369. "Findings of fact are clearly erroneous only when no competent evidence supporting the finding[s] exists in the record." *State v. Weinschenk*, 2005 ME 28, ¶ 8, 868 A.2d 200, 204–05.

[¶ 19] The court provided a cogent explanation for its imposition of the penalty against Curro:

[Curro] set the contract prices and directed the sales effort. He was personally aware of the security requirements imposed by 10 M.R.S.A. § 1110; he knew that the companies had not met the statutory security requirements; he knew that the companies were in a precarious financial position; at his direction at least some customers were misinformed to the effect that the companies were in compliance with 10 M.R.S.A. § 1110. Nevertheless, he directed that the companies continue to sell the prepaid contracts.

[¶ 20] There was ample evidence supporting the court's findings. The former general manager of Veilleux Oil testified that Curro had decided that the prepaid contracts would be sold and that he had set their prices; this establishes that Curro intentionally sold the contracts. A letter that Curro signed and sent to potential customers stating that the company was in compliance with the security requirements for prepaid contracts required by Maine law, 10 M.R.S. § 1110(2), demonstrates that he knew the requirements of the statute. Finally, the evidence established that Curro knew his companies were in financial distress and would be unable to fulfill their contractual promises. The court's ultimate conclusion that the evidence established, by the fair preponderance standard, that Curro acted intentionally, was sound.

The entry is:

Judgment affirmed.